# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

2023 Spring Term

_____

No. 22-ICA-36

_____

FILED

**June 7, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

CHARLES WV MALL, LLC,
Defendant Below, Petitioner,

v.

CHARLESTON URBAN RENEWAL AUTHORITY,
Intervenor Below, Respondent,

and

UMB BANK, N.A., AS SUCCESSOR TRUSTEE FOR
THE BONDHOLDERS FOR THE SERIES 1996C
SUBORDINATE CAPITAL APPRECIATION PARKING
FACILITY REFUNDING BONDS,
Third Party Defendant Below, Respondent.

_____

Appeal from the Circuit Court of Kanawha County

Honorable Joanna I. Tabit, Judge

Civil Action No. 17-C-1527

REVERSED AND REMANDED WITH DIRECTIONS

_____

Submitted: April 4, 2023

Filed: June 7, 2023

Mychal S. Schulz, Esq.
Charles F. Saffer, Esq.
Babst, Calland Clements & Zomnir, P.C.
Charleston, West Virginia
Counsel for Petitioner

Ann R. Starcher, Esq.
Thomas G. Casto, Esq.
Lewis Glasser PLLC
Charleston, West Virginia
Counsel for Respondent Charleston
Urban Renewal Authority

Shawn P. George, Esq.
Jennie O. Ferretti, Esq.
George & Lorensen PLLC
Charleston, West Virginia
Counsel for Respondent
UMB Bank, N.A.

CHIEF JUDGE GREEAR delivered the Opinion of the Court.

JUDGE LORENSEN, voluntarily recused.

JUDGE PHILLIP M. STOWERS, sitting by temporary assignment.

GREEAR, Chief Judge:

Petitioner, Charles WV Mall, LLC ("Petitioner") appeals an order of the Circuit Court of Kanawha County, entered on July 8, 2022, granting Respondents, Charleston Urban Renewal Authority and UMB Bank, N.A.'s (collectively "Respondents") *Motion to Reopen Civil Action and Enforce Prior Orders of the Court*.

Having reviewed this matter, we conclude that the circuit court erred in granting Respondents' motion, as the basis for the prior order that Respondents sought to enforce was a contractual relationship that no longer exists. Accordingly, we remand this case to the Circuit Court of Kanawha County for further proceedings consistent with this opinion.

## Background

In 1983, Charleston Town Center ("Mall") opened for business in Charleston, West Virginia. As a part of its operations, the Mall entered into written lease agreements with its tenants, which commonly contained "additional rent" charges for the operation and maintenance of the Mall's parking garages. These parking garages are situated on land owned by Charleston Urban Renewal Authority ("CURA"). UMB Bank, N.A. ("UMB Bank") is the bond trustee for the bonds sold by Charleston Building Commission ("CBC") to finance the construction of the parking garages. Originally, four anchor stores owned their respective corner lots; the Mall was owned by the developer; and the parking garages were leased by an affiliate of the developer from CBC.[1] During the developmental stage, CURA and the original developer entered into various agreements with one another and

---

[1] The anchor stores included Sears, Roebuck and Co., The May Department Stores Company, The Montgomery Wards Group, and The Penney Group.

1

the four anchor stores concerning the construction, development, and ownership of the Mall. Those agreements included the *Construction, Operation and Reciprocal Easement Agreement* ("*COREA*") executed on April 20, 1982, and the *Joint Development Agreement* ("*JDA*") with *Attachment No. 4*, executed on April 15, 1981. Both of those agreements were recorded in the land records in Kanawha County.

Section 10.9(b)(ii) of the *COREA* states:

> No charge of any type shall be made to or collected from any Occupant or other Permittee for parking in the Parking facility, except (i) as provided in Exhibit G [parking regulations and hourly rates] and (ii) Occupants may be required to pay Developer or Operator parking charges pursuant to their respective Leases or Separate Agreements . . . .

Further, section II(D) from *Attachment No. 4* of the *JDA* provided:

> In addition to the receipts derived from the Operation of the Parking Facility, the Developer shall provide additional income for the Parking Facility from the Mall Tenants in the Retail Center in the amount of a minimum of contribution of sixty cents per square foot of gross leasable area of the Mall Space escalated every five years by an additional ten cents per square foot, all payments for parking received by the Developer from Mall Tenants in excess of said sixty cents per square foot of gross leasable area of Mall Space and payments, if any, for parking received by the Developer from Department Stores in the Retail Center.

In 2007, the original developer transferred its interest in the Mall to Charleston Town Center SPE, LLC, ("SPE"), who then obtained a $100,000,000 loan from Morgan Stanley Mortgage Capital, Inc. To secure payment of sums due under the loan, SPE executed a deed of trust and security agreement. Under the deed of trust, SPE conveyed the title to the Mall as security. In 2017, after the deed of trust was assigned to US Bank,

2

US Bank filed a complaint in the Circuit Court of Kanawha County in which it asked the court to declare that SPE defaulted on its loan and to have a receiver appointed to preserve and protect the Mall pending the trustee's sale of the same. Subsequently, CURA and the City of Charleston filed a motion to intervene, which was granted.

On April 27, 2018, the circuit court entered an order for the appointment of both a Mall Receiver and a Parking Garage Receiver. Thereafter, all parties to the litigation, except US Bank, filed the *Joint Motion to Transfer the Mall Tenant Parking Charges from Mall Receiver to Garage Receiver*. The motion was based on: (1) *Attachment No. 4 of the JDA*; (2) Section 10.9(b) of the *COREA*; (3) the parking charge lease provision in tenant leases; and (4) the course of performance regarding the parking garage tenant charges from the beginning of the Mall's operation until the filing of the motion. On January 14, 2019, the circuit court entered its *Order Granting Joint Motion for Transfer of Mall Tenant Parking Charges from Mall Receiver to Garage Receiver*. In that order, the circuit court found:

> 3. Mall tenants understood, agreed to, and have been paying parking charges in monthly installments for the operation and maintenance of the adjacent parking garages, based on a dollar amount per square foot and their gross leasable area. Such monthly installments were subject to increase over time. This is seen with clarity in the customary parking charge lease provision:
>
> Section 12.6-Parking
>
> Landlord agrees to provide parking facilities adjacent to the Shopping Center for parking of motor vehicles. For each calendar year, Tenant agrees to pay Landlord annually, in twelve (12) equal monthly installments, together with the other charges specified in Article XII, as additional rental for the operation and maintenance of the garage, an amount equal to One and 60/100 Dollars ($1.60) per square foot, multiplied by the Premises CLA . . . .

4. The purpose of the Mall assessing parking charges to tenants was to support the operations and maintenance of the parking garages . . . .

7. Original to the development of the Mall is [the JDA] . . . This cornerstone document was recorded by the Clerk of the Kanawha County Commission . . . . Attachment No. 4 to the JDA . . . memorializes that [Mall developer] was charged with providing additional income for the parking garages from the Mall tenants at a certain rate. (paragraph goes on to quote section II(D) from Attachment No. 4)

8. Section 10.9 of the COREA concerns the operation of the parking garages and refers to them as the "Parking Facility." Section 10.9(b)(ii) provides that occupants, such as tenants, may be required to pay parking charges pursuant to their respective leases or other separate agreements . . . .

10. Beginning in 1984, there has been a uniform custom and practice regarding the handling of tenant parking charges. The Mall collected such charges and remitted them to the parking garage on a monthly basis. These charges were classified as a payable to the Mall and as a receivable of the parking garage . . . .

18. There is a clear history of more than three decades of the Mall remitting the collected tenant parking charges to the parking garage on a monthly basis to support parking garage operations and maintenance . . . .

After the appointment of receivers and entry of the January 14, 2019, order, U.S. Bank foreclosed on the Mall and the Mall Receiver was terminated. In April of 2020, the remaining parties to the civil action, except US Bank, entered into a settlement agreement.[2] The settlement agreement contained broad releases by CURA and UMB Bank in favor of the former mall owner, developer, and their successors and assigns for any claims that arose from or were related to, directly or indirectly, the Mall's parking garages. The settlement agreement also resolved the remaining claims between the parties to the settlement

---

[2] The remaining parties included CURA, UMB Bank, and SPE.

agreement.[3] On August 26, 2020, US Bank and CURA entered into an *Amended and Restated Joint Development Agreement* ("*Restated JDA*"). On September 25, 2020, the circuit court entered a final order terminating the parking garage receiver and dismissing the civil action.

Petitioner purchased the Mall from U.S. Bank in May of 2021. After requesting the turnover of parking garage tenant charges from Petitioner and Petitioner's refusal, CURA and UMB Bank filed a *Motion to Reopen Civil Action and Enforce Prior Orders of the Court*. Pursuant to the circuit court's January 14, 2019, order, Respondents sought to have Petitioner turn over the parking garage tenant charges it collected and withheld from CURA and UMB Bank since it acquired the Mall. The circuit court granted Respondents' motion by order entered on July 8, 2022.

In its order, the circuit court held that section 4.2 of the *Restated JDA* did not release Petitioner of its obligations under the *COREA*; that its January 14, 2019, order remained enforceable as to Petitioner by virtue of its purchase of the Mall from US Bank; and that Petitioner was not a successor or third-party beneficiary to the settlement agreement. Thus, Petitioner was not released from the continuing obligation to turn over parking garage charges. The circuit court's July 8, 2022, order further "reopens" the action for enforcement purposes only. In reaching its final determination, the circuit court relied on the contractual relationships in place in 2019. It is from the July 8, 2022, order that Petitioner appeals.

---

[3] Petitioner notes that under the terms of the settlement agreement, CURA and UMB Bank received approximately $5.3 million plus conveyance of the Macy's parcel and the Quarrier Street parcel as consideration.

## Standard of Review

Our appellate review of the circuit court's final order is performed under an abuse of discretion standard. Syl. Pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 179, 469 S.E.2d 114, 115 (1996). We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed de novo. *Id.* With these standards in mind, we consider the issues raised on appeal.

## Discussion

On appeal, Petitioner asserts five assignments of error:

1. The circuit court erred in finding that the original order, which was not recorded in the real estate records and was issued in a previously dismissed civil action, binds Petitioner by virtue of its purchase from U.S. Bank;

2. The circuit court erred in making numerous findings of fact for which no evidence was submitted or heard by the court;

3. The circuit court erred in finding that Petitioner is contractually obligated under the *COREA* to pay over/remit parking fees collected under tenant leases to the manager of the parking garage;

4. The circuit court erred in finding that Petitioner is not a beneficiary of or successor to the settlement agreement, which resulted in the dismissal of the underlying civil action in 2020; and

5. The circuit court erred in not determining that Section 4.2 of the *Restated JDA* replaced the prior payment arrangement concerning parking fees collected under tenant leases.

Several of Petitioner's assignments of error can be distilled into one issue—did the circuit court err in enforcing the January 14, 2019, order, when that order was based upon

6

a contractual relationship that may not currently exist between the parties herein.[4] As to this issue, we find the circuit court erred in enforcing the 2019 contractual provisions against Petitioner.

The Supreme Court of Appeals of West Virginia ("SCAWV") has long held that a circuit court has the inherent power to do those things necessary to compel a party's compliance with prior agreements, to enforce its prior orders, and to protect the court from acts obstructing the administration of justice, including the use of its contempt powers. *W. Virginia Dep't of Health & Hum. Res., Bureau for Behav. Health & Health Facilities v. E.H.*, 236 W. Va. 194, 210, 778 S.E.2d 643, 659 (2015). Furthermore, "a trial court always has inherent authority to regulate and control the proceedings before it and to protect the integrity of the judicial system." *Clark v. Druckman,* 218 W. Va. 427, 435, 624 S.E.2d 864, 872 (2005). However, we are mindful that the exercise of this inherent power must be procedurally proper.

It is undisputed that when parties to litigation fail to comply with a clear directive as contained in a court order, compliance may be compelled by the court. However, when the prior order is based on contractual obligations, like the January 14, 2019, order, the scope of the order is limited to the existing contractual relationship of the parties. When the contractual relationship of the parties has changed, the court cannot exercise its inherent power of enforcement, as the current contractual relationship between the parties has not

---

[4] *See generally Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 227 (2012) (assignments of error will be consolidated and discussed accordingly).

been litigated. The same principles would prohibit the application of the original order in subsequent litigation under the doctrine of res judicata.

"The doctrine of res judicata is based on a recognized public policy to quiet litigation and on a desire that individuals should not be forced to litigate an issue more than once." *Baker v. Chemours Co. FC, LLC*, 244 W. Va. 553, 557, 855 S.E.2d 344, 348 (2021) (internal citations omitted). The usage of a summary mechanism, such as a motion to enforce a prior order, is based on a final and conclusive adjudication of the same issue or common claim.[5] However, parties should not be prevented from litigating new issues under the now existing contractual relationship. In determining whether an issue has been fully adjudicated, such that a motion to enforce would be proper, this Court will employ the same principles underlying the doctrine of res judicata. As discussed in syllabus point 4 of *Blake v. Charleston Area Medical Center, Inc.*, 201 W. Va. 469, 498 S.E.2d 41 (1997), the SCAWV has stated that res judicata requires:

> First, there must have been a final adjudication on the merits in the prior action by a court having jurisdiction of the proceedings. Second, the two actions must involve either the

---

[5] When dealing with a party's motion to enforce a court order:

> A court's power to enforce a judgment is confined to the four corners of the judgment itself. Enforcement proceedings are summary in nature; they cannot be used to take up matters beyond the contours of the judgment and thereby short-circuit the usual adjudicative processes. Consequently, when a matter is beyond the scope of a judgment, no relief is available through a motion to enforce the judgment.

*Harvey v. Johanns,* 494 F.3d 237, 244-245 (1st Cir. 2007) (citing *Fafel v. Dipaola*, 399 F.3d 403, 411 (1st Cir. 2005)).

same parties or <u>persons in privity with those same parties</u>. Third, the cause of action identified for resolution in the subsequent proceeding either <u>must be identical</u> to the cause of action determined in the prior action or must be such that it could have been resolved, had it been presented, in the prior action.

*Id.* (emphasis added). "One of the essentials of res judicata is that the issue raised in the second action or suit must be identical with the issue raised and determined in the first action or suit." *Soto v. Hope Nat. Gas Co.*, 142 W. Va. 373, 95 S.E.2d 769 (1956). In the instant case, the question before us is whether the issues decided by the prior order and its related cause of action were identical to those sought to be enforced against Petitioner. We find that they are not identical.

In the 2017 underlying action, the circuit court specifically determined the *JDA* with *Attachment No. 4* was integral to its final determination. The *COREA* and the *JDA* with *Attachment No. 4* supported the contractual obligation as evidenced in the past practices of the parties to those contracts. Those contractual obligations were binding upon the parties to that litigation and, assuming proper notice, would have continued to run with the land, preserving the identical nature of the causes of action. However, the contractual relationship that provided the basis for the January 14, 2019, order changed upon the adoption of the *Restated JDA*.[6]

---

[6] *See TD Auto Finance LLC v. Reynolds*, 243 W. Va. 230, 843 S.E.2d 783 (2020) (holding that separate written instruments will be construed together and considered to constitute one transaction where the parties and the subject matter are the same, and where there is clearly a relationship between the documents; however, when a merger clause is used in a subsequent agreement, unless specifically incorporated therein, clauses, such as an arbitration clause contained in the original agreement, will not be enforceable under the subsequent agreement).

Pursuant to the express language in the *Restated JDA*, the original *JDA* was "no longer effective for its purpose, and the parties wish[ed] to enter into this Agreement." Section 1.1 of the *Restated JDA* states:

> The Prior Agreement, and any attachments, amendments, or supplements thereto, are hereby amended and restated, and are superseded and replaced by this Agreement and all Attachments attached hereto . . . For avoidance of any doubt, and without intending to limit any of the foregoing, the parties hereto acknowledge and agree that Attachment 4 to the Prior Agreement is void and of no further effect and is superseded by this Agreement.

Further, Article IV, Section 4.2 of the *Restated JDA* provides:

> The Mall Owner, its successors, and assigns . . . shall pay the Authority an annual additional payment ("Annual Additional Payment") based on rents received by the Mall Owner from tenants for space in the Town Center Parcel, and in lieu of any other payments due from Mall Owner on account of rents collected from Town Center Parcel Tenants and/or on account of Mall Owner's maintenance obligations associated with the Parking Parcel . . . .

These sections show a clear intent of the parties to void and replace the *JDA* and *Attachment No. 4*, as executed in 1981. *See Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996) (contracts containing unambiguous language must be construed according to their plain and natural meaning); *See also* Syl. Pt. 3, *Miller v. WesBanco Bank, Inc.*, 245 W. Va. 363, 859 S.E.2d 306 (2021) ("A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent"). Once the contractual relationship of the parties changed, the issue for determination by the court also changed and was no longer

10

identical to the issue decided by the January 14, 2019, order. A review of the new contractual relationship between the parties herein must be undertaken by the circuit court.

A simple reopening and enforcement of a prior order would circumvent the right of the parties to have their new contractual relationship fully considered by the court. Additional litigation is required to determine the rights of the parties under the new contractual dynamic. Such litigation will afford the parties an opportunity to establish the breadth and scope of their new contractual relationship, as well as provide each party due process and the opportunity to advocate their respective positions under the new contract provisions.

It is important to note that the Circuit Court may conclude, after litigation of the new contractual relationship, that the duties of the parties with respect to the parking garage tenant charges have not changed. However, under the limited facts and circumstances of this case, it would be improper for Petitioner to be bound by a prior court order interpreting a contractual framework that may no longer exist. Nothing in this opinion shall prohibit the Circuit Court from exercising further consideration and potential resolutions in this matter on separate bases that are not currently before this Court.

**Conclusion**

For the foregoing reasons, the July 8, 2022, order of the Circuit Court of Kanawha County is hereby reversed. This case is remanded to the Circuit Court of Kanawha County for the entry of an order denying Respondents' *Motion to Reopen Civil Action and Enforce Prior Orders of the Court*. In no instance should this Court's ruling be construed as

11

suggestive of an outcome or determination with respect to the merits of the underlying case.

**Reversed and Remanded with Directions**